Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | David H. Coar | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| CASE NUMBER | 03 C 2664 | DATE | 9/3/2004 |
| CASE TITLE | Zamecnik vs. Abbco, Inc. | | |

MOTION: [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

Cross-Motions for Summary Judgment

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] For the reasons set forth in the attached memorandum opinion and order, Defendant's Motion for Summary Judgment [Doc. 35] is GRANTED and Plaintiff's Motion for Summary Judgment [Doc. 37] is DENIED. This case is closed. Any and all other motions are moot and terminated.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | Document Number |
|---|---|---|---|---|
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | SEP 8 - 2004 date docketed | |
| ✓ | Docketing to mail notices. | | | 58 |
| ✓ | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |
| jar(lc) | courtroom deputy's initials | U.S. DISTRICT COURT 2004 SEP -7 PM 2:58 Date/time received in central Clerk's Office | date mailed notice mailing deputy initials | |

GARY ZAMECNIK )
)
) No. 03 C 2664
Plaintiff, )
) HONORABLE DAVID H. COAR
v. )
)
ABBCO, INC. ERISA PLAN, CNA )
INSURANCE Co., & ABBCO, Inc. )
Defendant. )

## MEMORANDUM OPINION AND ORDER

This is an action under the Employee Retirement Income Security Act ("ERISA"), for payment of disability insurance benefits. Plaintiff Gary Zamecnik ("Zamecnik" or "Plaintiff") claims that Defendant Continental Casualty Company ("Continental") wrongfully denied benefits to him under ERISA, 29 U.S.C. §1132(a)(1)(B). The parties have filed cross-motions for summary judgment. For the reasons set forth in this opinion, the Plaintiff's Motion for Summary Judgment is denied and the Defendant's Motion for Summary Judgment is granted.

I. FACTS

Plaintiff Zamecnik was an employee of Defendant Abbco, Inc. He began working for Abbco in April 1969. Plaintiff assumed the position of sales manager at Abbco in 1975. He occupied that position until his employment with Defendant ceased on September 6, 1999. According to Abbco, the sales manager position requires one hour of standing, two hours of walking, and six hours of sitting in an average nine hour day. (A.R. 281) The position does not involve lifting or carrying, nor does it require use of extreme postures such as stooping, climbing,

kneeling, crouching, bending, twisting, or reaching. (A. R. 282)

A. **THE BASIC TERMS OF THE DISABILITY INSURANCE PLAN**

As an active, full-time employee of Abbco, Plaintiff was a participant in Abbco's long-term disability insurance plan ("the Plan"). Abbco established the Plan with Defendant Continental Casualty Company in 1988. Under the Plan, an employee experiences "total disability" when the employee is:

(1) continuously unable to perform the substantial and material duties of his regular occupation;

(2) under the regular care of a licensed physician other than himself; and

(3) not gainfully employed in any occupation for which he is or becomes qualified by education, training or experience.

(A.R. 12.) An employee seeking to make a claim under the Plan must provide to Continental "written notice of claim . . . within 30 days after the loss begins or as soon as reasonably possible." (A.R. 16.) Once Continental receives "written notice of claim", the Plan requires that it furnish claim forms within 15 days. If Continental does not provide these claim forms, "the claimant will be considered to have met the requirements for written proof of loss" if the notice of claim "describes the occurrence, extent and nature of the loss." (Id.) The Plan further requires the employee to provide "written proof of loss . . within 90 days after the end of a period for which [Continental is] liable." (Id.) If it is not possible to give the proof within 90 days, "the claim is not affected if the proof is given as soon as reasonably possible. Unless the Insured Employee is legally incapacitated, written proof must be given within 1 year of the time it is otherwise due." (Id.)

B. **PLAINTIFF'S CLAIM UNDER THE PLAN**

2

Plaintiff ceased actively working for Abbco on September 7, 1999. On or about January 10, 2001, Plaintiff first notified Continental of his claim for benefits under the Plan, claiming disability beginning September 7, 1999.[1] Plaintiff's claim form seeks coverage for total disability as a result of "rheumatoid arthritis – joint surgery – accident motor veh. 6-3-00." After receiving medical documentation in support of Plaintiff's claim, Continental notified Plaintiff on May 4, 2001 that his claim had been rejected. Plaintiff, acting through his attorney, filed a formal appeal of the claim on August 2, 2001, that included additional supporting documentation. On September 24, 2001, Continental informed Plaintiff that his appeal was denied. On November 20, 2001, Plaintiff submitted further documentation supporting his claimed disability. Continental considered this documentation and reiterated the denial of the claim on January 2, 2002. This is the final claim denial that Plaintiff received.

The Administrative Record reveals that on or about January 23, 2002, Lisa Welsh in the Illinois Department of Insurance contacted Continental to query whether Plaintiff's records had been reviewed by an independent medical examiner. (A.R. 043.) On January 25, 2002, Ms. Welsh sent Continental a letter indicating that the department was "unable to close [their] file" because "the information . . . does not confirm that Mr. Zamecnik was not disabled from September 8, 1999 to December 1, 1999." (A.R. 033.) Thereafter, Continental submitted the record to an independent medical analysis performed by Dr. Eugene Truchelut, M.D. In a report dated February 12, 2002, Dr. Truchelut concluded that "the medical records as submitted do not clearly indicate a continuous functional impairment subsequent to 9/6/99." (A.R. 029.)

---

[1] The claim form is dated October 15, 2000, but the Plaintiff does not contest that Continental did not receive it until January 10, 2001.

Continental forwarded this report to the Illinois Department of Insurance on February 14, 2002. (A.R. 024) There is no indication in the record that Continental forwarded this report to Plaintiff prior to the onset of litigation.

### C. PLAINTIFF'S DOCUMENTATION OF DISABILITY

Plaintiff was receiving treatment from three doctors: Dr. James Nuzzo, a podiatrist; Dr. Thomas Palella, a rheumatic disease specialist; and Dr. John Sage, the primary treating physician after Plaintiff's motorcycle accident in June 2000.

#### 1. Plaintiff's Records from Dr. Nuzzo

Plaintiff's treatment from Dr. Nuzzo began in April 1996, when Dr. Nuzzo saw him for heel pain. (A.R. 293) Dr. Nuzzo recommended Plaintiff see a rheumatologist at that time, which led to Plaintiff's relationship with Dr. Thomas Palella (which is discussed below). Dr. Nuzzo did not see Plaintiff again until September 20, 1999. Dr. Nuzzo's notes from that visit indicate that Plaintiff was experiencing rheumatoid arthritis that was "very painful" and causing "excruciating pain." (A.R. 293) Plaintiff was injected with Marcaine that day to decrease the pain. (A.R. 293) On September 30, 1999, Plaintiff saw Dr. Nuzzo again and was "much † [improved]. To correct after Thanksgiving." (A.R. 293) On December 1, 1999, Dr. Nuzzo performed a bunionectomy on Plaintiff's right big toe. Dr. Nuzzo indicated that Plaintiff was disabled as a result of that condition, but Plaintiff's recovery was swift. As of January 14, 2000, Plaintiff was "healed without complication" from the surgery. (A.R. 294) On February 14, 2000, Dr. Nuzzo was pleased with Plaintiff's recovery and was set to release him to work on March 1, 2000. (A.R. 294) By April 4, 2000, Plaintiff was asymptomatic, happy, and pain-free. (A.R. 294) Dr. Nuzzo later sent a letter indicating that his conclusions about Plaintiff on April 4, 2000 were limited to

4

his area of treatment, i.e. Plaintiff's feet. (A.R. 125)

Plaintiff saw Dr. Nuzzo again on July 24, 2000 after Plaintiff banged his toe against a dresser in early July. (A.R. 295) Dr. Nuzzo administered an injunction of Marcaine to ease the pain (A.R. 295) On August 7, 2000, Plaintiff felt almost 100 percent better since the injection. (A.R. 295) Plaintiff returned to Dr. Nuzzo on September 7, 2000 complaining of "lesser metatarsalgia." (A.R. 295) Dr. Nuzzo suggested Plaintiff use orthotics. On October 12, 2000, Dr. Nuzzo noted Plaintiff could walk better with the inserts and "not for long, and almost not at all without orthotics." (A.R. 295)

### 2. Plaintiff's Records from Dr. Palella

Plaintiff had been receiving treatment from Dr. Thomas Palella since April 1996 for a seronegative spondyloarthropathy. (A.R. 270) Seronegative spondyloarthropathy is a "family of arthritic disorders" that "constitute a heterogeneous group of diseases, more common in males, manifest by inflammatory disease involving the sacroiliac joints, spinal joints, and peripheral joints." (A.R. 128) On January 13, 1999, Plaintiff visited Dr. Palella complaining of right shoulder, elbow, knee, and lower back pain. (A.R. 113) On February 25, 1999, Plaintiff visited Dr. Palella complaining of fatigue and poor sleep due to back pain. (A.R. 114) In July 1999, Plaintiff visited Dr. Palella again after he tore his anterior cruciate ligament playing volleyball. (A.R. 088) In July 1999, Dr. Palella indicated that Plaintiff was "overall doing well." (A.R. 088)

Dr. Palella's next record is on September 2, 1999, when Plaintiff called complaining of right arm and elbow pain. (A.R. 267) The phone message indicates that the situation was "Emergency!" (A.R. 267) Dr. Palella did not see Plaintiff until November 9, 1999 in connection with these complaints. (A.R. 268). Dr. Palella's notes from that meeting indicate that Plaintiff

5

was "doing fairly well lately - minor occ[asional] L[ow] B[ack] P[ain]." (A.R. 268). On January 18, 2000, Dr. Palella wrote a letter "to whom it may concern" indicating that Plaintiff "was doing fairly well [on November 9, 1999] although he was not entirely free of joint problems involving his low back, left great toe, left knee and right elbow." (A.R. 270) On March 21, 2000, Plaintiff complained to Dr. Palella of arm and chest pain; Dr. Palella also noted increased low back pain at that time. (A.R. 273)

On June19, 2000, Plaintiff visited Dr. Palella subsequent to a major motorcycle accident on June 3, in which he ruptured his spleen and fractured multiple ribs. (A.R. 259) Dr. Palella's notes from July 12, 2000 indicate Plaintiff was experiencing back and rib pain with any activity. (A.R. 257) On August 15, 2000, Plaintiff complained to Dr. Palella of constant right side flank pain that increased with change in posture, breathing, coughing and eating. (A.R. 252) On November 14, 2000, Dr. Palella noted that Plaintiff was in constant back pain, sleeping poorly, and experiencing daily cervical pain in the mornings. (A.R. 241) On January 22, 2001, Plaintiff saw Dr. Palella and complained of hip and back pain, left shoulder pain, and weakness in his knee. (A.R. 235)

In a letter "to whom it may concern" dated October 4, 2000, Dr. Palella provides a narrative history of his treatment of Plaintiff up to that date. (A.R. 326) He wrote that Plaintiff had "ongoing joint problems to varying degrees" from 1996 through most of 1998. (A.R. 328) Plaintiff "showed some improvement in early 1999 but then suffered his left ACL tear in June which limited his mobility for a time." (A.R. 328) The next note is of the motorcycle accident on June 3, 2000, which led Dr. Palella to the conclusion "based on my most recent assessments of him on June 19, 2000 and August 15, 2000" that Plaintiff "is disabled." (A.R. 328)

On a claim-related form dated December 14, 2000, Dr. Palella indicated that he first advised Plaintiff to cease work on September 7, 1999. In a letter dated March 15, 2001, Dr. Palella informed Defendant that it is his opinion that Plaintiff had been disabled "for some time" from his usual occupation. (A.R. 280) In a letter dated July 13, 2001, Dr. Palella wrote that he concluded "in the latter months of 1999 . . . that [Plaintiff] was disabled from his occupation as a sales manager." (A.R. 129) Dr. Palella also noted in the July 13 letter that Plaintiff remains disabled and was unlikely to be able to return to gainful employment in the foreseeable future. (A.R. 129)

### 3. Plaintiff's Records from Dr. Sage

Plaintiff saw Dr. Sage on June 15, 2000. Dr. Sage performed a splenectomy on Plaintiff. On July 7, 2000, Dr. Sage noted that Plaintiff was well-healed from his surgery and that he could return to work on July 24, 2000. Dr. Sage later wrote and indicated that this return to work date was "written in error." (A.R. 126) Dr. Sage explained: "My intent was to inform the patient that as far as the acute problems of the motor vehicle accident, I thought that he was returning to his baseline level and I . . . was turning him over to the chronic care of the rheumatologist and podiatrist. . . . I did not feel that his episode related to the [motor vehicle] trauma was in itself an impediment for his returning to work." (A.R. 126)

On August 14, 2000, Dr. Sage noted that Plaintiff's pain had returned under his rib cage and flank, and it worsened with movement. (A.R. 208) Dr. Sage also noted on September 22, 2000, that Plaintiff's pain increased with food. (A.R. 212)

## II. DISCUSSION

### A. STANDARD OF REVIEW

This court will review a plan administrator's denial of benefits de novo "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989). See also Militello v. Central States, Southeast and Southwest Areas Pension Fund, 360 F.3d 681, 685 (7th Cir.2004); Hackett v. Xerox Corp. Long-Term Disability Income Plan, 315 F.3d 771, 773 (7th Cir.2003). Where the plan grants discretionary authority to the administrator, the court reviews a denial of benefits under the arbitrary and capricious standard. Militello, 360 F.3d at 685; Hackett, 315 F.3d at 773. Accordingly, under ERISA, "[t]he standard of review depends on the amount of discretion that plan documents afford the plan administrator."" Militello, 360 F.3d at 685. There is no dispute that the de novo standard of review is applicable to Continental's decision to deny Plaintiff's claim for benefits.

When applying a de novo standard, the Seventh Circuit has urged district courts to "restrict [themselves] to the evidence before the plan administrator" unless circumstances clearly establish that additional evidence is necessary. See Casey v. Uddeholm Corp., 32 F.3d 1094, 1099 (7th Cir. 1994). Both parties have represented to the court that they have no additional evidence to supplement the administrative record, so this is not a case where additional evidence is necessary. Consequently, a decision on the merits at the summary judgment stage is appropriate.

**B.    DISCUSSION**

The policy under which Plaintiff seeks disability benefits has only three requirements: (1) Plaintiff must be continuously unable to perform the substantial and material duties of his regular occupation; (2) Plaintiff must be under the regular care of a licensed physician other than

himself; and (3) Plaintiff is not gainfully in any occupation for which he is or becomes qualified by education, training or experience. In this case, there is no dispute that Plaintiff was under the regular care of a licensed physician on the date he stopped working. Nor is there any dispute that Plaintiff is not gainfully employed nor has he been gainfully employed since the date he stopped working for Defendant. This case hinges on whether Plaintiff was "continuously unable to perform the substantial and material duties of his regular occupation" as of the date he stopped working: September 7, 1999.

Plaintiff has submitted a substantial amount of medical documentation of his disability. Unfortunately for Plaintiff, the vast majority of the documentation he has submitted relates to injuries and other developments in his health that he sustained after September 7, 1999. Plaintiff's motor vehicle accident in June 2000, which is listed as one of the sources of his disability on his original disability claim, is frankly irrelevant to the question of whether he was disabled as of September 7, 1999. The Court will properly focus the inquiry on Plaintiff's health issues preceding the alleged date of disability onset.

In July of 1999, Plaintiff tore his anterior cruciate ligament in a volleyball game. This is a serious injury to the knee that would doubtless limit Plaintiff's mobility during the period of recuperation. Plaintiff is not basing his disability claim on his knee injury in the volleyball game, though. Plaintiff's ability to participate in a volleyball game in July of 1999 suggests that his seronegative spondyloarthropathy was not crippling at that time. Dr. Palella's notes from a July visit confirm that Plaintiff was "overall doing well." (A.R. 088)

On September 2, 1999, Plaintiff called Dr. Palella to complain of pain in his right arm. The phone message subject reads "Emergency!" but then Plaintiff did not visit with Dr. Palella

until November 9, 1999. On that date, Dr. Palella indicated that Plaintiff was "doing fairly well lately." Dr. Palella's "to whom it may concern" letter of January 18, 2000 reaffirms that Plaintiff was "doing fairly well" on that visit. (A.R. 270) Dr. Palella's second "to whom it may concern" letter of October 4, 2000, which provides a narrative account of Dr. Palella's treatment of Plaintiff *prior to* Plaintiff's filing of a disability claim, does not mention anything significant in the latter part of 1999. It is curious then, that on December 14, 2000, with the disability claim clearly in contemplation, Dr. Palella indicated that September 7, 1999 was the date Plaintiff became totally disabled. Much later, on July 13, 2001, Dr. Palella wrote that Plaintiff's "disease as well as its treatment led [him] to conclude [in the latter months of 1999] that he was disabled from his occupation as a sales manager." There are no contemporaneous records to support that conclusion.[2]

The only other health concern that was afflicting Plaintiff around the time he stopped working for Defendant was the painful bunion in his right big toe. When he saw Dr. Nuzzo for this condition on September 20, 1999, it is apparent from the notes that the condition was extremely painful and probably somewhat crippling. Although the record is devoid of any indication that this painful bunion manifested prior to September 20, the Court will recognize that this painful condition might have arrived as early as September 7, 1999. Ten days later,

---

[2]Plaintiff also points to a June 15, 2001 letter from Dr. Sage that indicates Plaintiff "had been unable to work because of his spondyloarthropathy condition over one year prior to his accident [in June 2000]." (A.R. 127) As an evidentiary matter, this letter would be wholly inadmissible on this point. Dr. Sage had no relationship with Plaintiff prior to the motor vehicle accident in June 2000, so he has no basis to conclude when Plaintiff became unable to work. Additionally, if Dr. Sage's baseless conclusion were to be believed, Plaintiff's disability due to his seronegative spondyloarthropathy would have been complete before his volleyball injury in July 1999. If Plaintiff was able to perform on the volleyball court, he was surely able to perform his work duties "over one year prior to his accident."

10

however, Dr. Nuzzo's notes indicate that Plaintiff's condition was vastly improved after receiving treatment on the first visit. Between the time of Plaintiff's September 20, 1999 visit to Dr. Nuzzo and the December 1, 1999 bunionectomy, there is no indication in the record that Plaintiff would have been continuously unable to perform his regular work duties owing to the bunion. After the bunionectomy, his recovery was swift and complete. Again, this precludes the possibility that Plaintiff was continuously unable to perform his work duties owing to the bunion.

Outside of Dr. Palella's December 14, 2000 indication that Plaintiff's disability onset was September 7, 1999 and his July 13, 2001 letter concluding that Plaintiff was disabled "in the latter months of 1999," there is literally nothing in this administrative record that suggests Plaintiff became continuously unable to perform the duties of his occupation on September 7, 1999. Plaintiff asserts that Dr. Palella's post hoc conclusions about Plaintiff's onset of disability are sufficient because the plan does not require a specific quantum of medical evidence to prove disability. The plan requires the claimant to submit "due written proof of loss" in order to be eligible for benefits. A blank assertion from the claimant's treating physician over a year after the alleged onset of disability which is not supported by records at or around the time of the alleged onset of disability is simply not "due written proof of loss."

Plaintiff's chronic seronegative spondyloarthropathy was a condition with which he was able to work effectively for the previous three years. Approximately six weeks prior to Plaintiff's alleged onset of disability, the condition did not prevent Plaintiff from tearing his anterior cruciate ligament in a volleyball match. Dr. Palella's records of treatment for Plaintiff's seronegative spondyloarthropathy contain no indication that the condition worsened substantively between the July knee injury and the September 7, 1999 date Plaintiff ceased working. It is

11

impossible to conclude that Plaintiff was continuously unable to perform the duties of his occupation on the date he ceased working.

The irony in this case is that by the time Plaintiff filed his disability claim, well over a year after the alleged onset of disability, there can be no doubt that Plaintiff was totally disabled as that term is defined in the plan. Unfortunately for Plaintiff, there is simply no credible proof that he was totally disabled at the time he stopped working for Defendant. For this reason, the Defendant is entitled to summary judgment in its favor.

## CONCLUSION

For the reasons set forth above, the Court denies Plaintiff's Motion for Summary Judgment and grants Defendant's Motion for Summary Judgment.

**Enter:**

David H. Coar
**United States District Judge**

**Dated: September 2, 2004**

12